IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SAVON MALDEN,
     Plaintiff,

vs.                    Case No.: 3:18cv260/MCR/EMT

WINGS OVER EMERALD COAST
INCORPORATED agent of WINGSTOP,
and ANNE TAYLOR,
     Defendants.
_____/

## ORDER, REPORT AND RECOMMENDATION

This cause is before the court upon referral by the district court for the preparation of a Report and Recommendation on motions for costs and attorney fees filed by Plaintiff (ECF Nos. 17, 18). Defendants have filed a consolidated response in opposition to the motions (ECF No. 21), and Plaintiff has filed a motion seeking leave to file a reply to Defendants' response (ECF No. 23), to which Defendants have responded in opposition (ECF No. 24).

Background

Defendant Anne Taylor owned Wings Over Emerald Coast (hereinafter "Wingstop") between November and December of 2017, when Plaintiff Savon Malden was hired to work there and began working as a manager in training at an hourly rate of $9.25 (ECF Nos. 21-1 at 2; 18 at 1; 11 at 8). Malden worked at

Wingstop for only about five weeks when he was fired on December 31, 2017. Defendants state he was fired for violently threatening Defendant Taylor (ECF Nos. 21 at 1; 21-4 at 3; 21-1 at 2). At or about the time of his firing, the Pensacola Police Department issued a trespass warning to Malden, banning him from entering onto the Wingstop property for a six-month period, commencing on December 31, 2017 (ECF No. 18-7), evidently due to Malden's threats against Taylor.

Mr. Malden's final paycheck, in the amount of $543.30, was issued on January 9, 2018, but he did not receive this check right away for reasons the parties dispute. There is no dispute, however, that on January 15, 2018—just six days after the final paycheck issued—Malden conferred with Attorney Jeremiah Talbott regarding what ultimately became the instant FLSA action, filed less than one month after Malden met with Talbott (*see* ECF Nos. 1; 18-3 at 1; 21-4 at 58, 60; 21-5 at 4). As Mr. Malden testified at his deposition, he filed the instant suit to recover his final paycheck, and *only* to recover the final paycheck (*see* ECF No. 21-5 at 4).

As previously noted, the parties dispute *why* Mr. Malden did not receive his final paycheck right away. While the arguments are lengthy, Malden essentially asserts that because he could not return to the Wingstop premises, his final paycheck had to be mailed to him. He claims he provided his mailing address to Defendants but

states Defendants withheld his final check because they believed he had retained an employee handbook or operations manual worth $120.00, and they wanted him to return the manual (ECF No. 18 at 2). Malden claims he was advised that he would not receive his paycheck unless he returned the handbook or paid $120, the cost to replace it (*id.*). Malden also appears to contend that he did not possess the handbook or manual at issue, that he did not have $120 to pay for it, and that is why he contacted Talbott (*id.*).

Defendants generally contend that after Mr. Malden's final paycheck issued on January 9, 2018, Malden never asked that it be mailed to him but instead acknowledged that he "owed a debt" to Wingstop (i.e., the operations manual) and stated that he wanted to resolve the outstanding debt, potentially by permitting Wingstop to make a deduction from his final paycheck (*see* ECF No. 21 at 3–4). Defendants state Plaintiff agreed to this arrangement and never demanded his full paycheck regardless of the matter of the handbook.

More specifically, according to Anthony Reider, Wingstop's acting manager at the time of the relevant events, Mr. Malden and/or someone purporting to be his father called Wingstop several times after the final paycheck had issued on January 9 (*see* ECF No. 21-2 (hereinafter "Reider Aff.") at ¶¶ 4, 8; *see also* ECF No. 21-1

(hereinafter "Taylor Aff.") at ¶ 7). During at least one of these calls Reider discussed with Malden the matter of the missing manual and advised Malden that the manual cost $120 "if [Malden] wanted to pay for its replacement instead of returning it" (Reider Aff. at ¶ 7). Reider avers in his affidavit that at no time did he threaten to withhold Malden's paycheck pending receipt of the manual or $120 (*see id.*). Reider also avers that Malden acknowledged he previously possessed the manual but had lost it and therefore could not return it; as such, Malden advised he wished to pay for it (*id.* at ¶ 6). Based on the various phone conversations, Reider was of the impression that Malden intended to provide a signed, notarized statement to Wingstop, indicating that he wanted Wingstop to reduce the amount of his final paycheck by $120 to account for the missing handbook (*id.* at ¶ 7; *see also* ECF No. 21-4 at 3 (Affidavit of defense counsel Nancy Johnson)). Defendants state Malden never provided the statement, or advised that he would not be providing the statement.

Finally, Ms. Taylor also avers that Malden never asked Wingstop to mail his final paycheck to him, and she states that had he done so the check would have been mailed to him (Taylor Aff. at ¶ 8). She learned for the first time in mid-April of 2018 that Malden wanted his full paycheck, with no deduction for the manual, whereupon

she provided the paycheck to her attorneys so they could in turn provide it to Malden (*id.* at ¶ 9).[1]

Attorney Talbott's time records confirm that he first met with Malden on January 15, 2018, and that by January 25 *at the latest*, a decision to file this FLSA action had evidently been made, as evidenced by a billing entry that appears on January 25 referencing a "Complaint" (*see* ECF No. 18-3 at 1).  The complaint was then filed on February 13, 2018.  Stated succinctly, the primary theory of Malden's complaint is that a $120 deduction from Malden's paycheck would have deprived Malden of the federally mandated minimum wage for the 78 hours he worked between December 17 and 30, 2017, and thereby would have violated the FLSA (*see, e.g.*, ECF Nos 1; 11 at 10).[2]

---

[1] The undersigned has summarized the facts in dispute regarding the handbook, and the reason Malden's final paycheck was not initially retrieved or mailed to him, as generally set forth by both parties.  The undersigned notes, however, that a resolution of these factual disputes is not necessary in order to make the recommendations contained herein.  Stated differently, the undersigned's recommendations would be the same regardless of which version of the facts is correct.

[2] Malden also alleged Defendants failed to pay him for 1.5 overtime hours he worked during this same time period (*see* ECF No. 1), but Defendants dispute that he actually worked any overtime hours, alleging instead that Malden failed to clock out such that it *appeared* he had worked overtime. Nevertheless, payment for the 1.5 overtime hours was included in Malden's final paycheck (*see* ECF Nos. 21 at 3; 21-1 at ¶ 5; 21-4 at 60).

To reiterate, Malden testified that the sole basis for filing this lawsuit was to obtain his paycheck.  Talbott, too, admits that the "essential issue of [this case] was that Defendants unlawfully withheld Plaintiff's final paycheck and were also trying to get the [Malden] to agree, improperly, to set-off/offset his wages for the book that Defendants claimed that Plaintiff had" (ECF No. 18 at 2–3).  Yet notably absent from Talbott's billing records between the date he first met with Malden and the date he filed the complaint is any indication that Talbott attempted to contact Wingstop before filing suit.  The billing records show that Talbott did not call, write, email, or otherwise make any effort to obtain his client's paycheck from Wingstop, to discuss the issue of the offset, or to try to resolve a relatively simple matter *worth $543.30 to his client*.  Instead, Talbott "made a federal case" out of the matter by filing suit, paying the $400.00 filing fee, and issuing and causing to be served two summonses—thereby incurring expenses nearly equal to the total value of Malden's final paycheck the day this case was filed (*see* ECF Nos. 1, 4, 5; *see also* ECF No. 17-3).[3]

---

[3] Moreover, the expenses incurred in merely initiating this case, which total approximately $450 (*see* ECF No. 17-3), do not include the attorney fees incurred during the pre-filing stages of this case (namely, 5.2 hours of attorney and paralegal time expended between January 15 and February 13, 2018) (*see* ECF No. 18-3 at 1–2).  If included, the total accumulated expenses and attorney fees through February 13 *exceeded* the value of Malden's final paycheck at the time this case was filed.

After Defendants were served with the complaint and filed an answer, the attorneys participated in a Rule 26 planning meeting on April 19, 2018 (*see* ECF No. 9).  Attorney Talbott states that during this meeting he advised Defendants' counsel that the total amount owing to Plaintiff was approximately $1,000, which evidently included both the final paycheck amount and liquidated damages (*see* ECF No. 18 at 4).  Talbott claims that Defendants' counsel disagreed with his assessment of the case as to liquidated damages, claimed that they did not withhold Plaintiff's paycheck due to the missing handbook, and evidently claimed that in any event they could have offset Malden's final wages to account for the missing handbook (*id*.).

Following the planning meeting, which is apparently when Defendants' attorneys first learned that Malden contested the matter of the "missing" handbook and wanted his final paycheck with no deduction, they obtained the final paycheck from Ms. Taylor and then provided the paycheck to Talbott (*see* ECF No. 21 at 4; Taylor Aff. at ¶ 9).[4]  No deduction for the handbook was made from the final paycheck, and in correspondence sent along with the check to Talbott, Defendants' counsel reiterated their contention that no liquidated damages were owed or

---

[4] The parties dispute precisely when Malden's paycheck was mailed to Talbott.  Suffice it to say, it was within about two weeks of the parties' planning meeting (*see, e.g.,* ECF No. 21-4 at ¶ 10, affidavit of defense counsel Nancy Johnson, stating she placed the check in the mail to Talbott on May 2, 2018; ECF No. 18 at 8, statement of Talbott, indicating Malden received the check on May 6, 2018).

warranted.  Moreover, in an effort to fully settle the matter, Defendants offered to pay $50.00 in addition to the final paycheck amount (ECF No. 18 at 5).  Talbott then inquired of Defendants' counsel regarding whether they would agree to pay attorney fees and costs, given that the prior correspondence from Defendants' counsel was silent on this issue.  When Defendants' counsel responded that they did not consider Plaintiff to be a "prevailing party" under these circumstances, and, correspondingly, that Talbott was not entitled to attorney fees, Talbott responded that he "had no alternative but to take depositions and perform discovery" (*id*. at 6).

When Talbott rejected Defendant's offer of $50.00, on May 10, 2018, he had invested only about 12.8 hours "litigating" the case (*see id.*), and his client had already received what he wanted from this litigation—his paycheck.  But after May 10, Talbott invested significantly more time in the case, ultimately expending a total of more than **92 hours**, for which he now seeks nearly **$28,000.00** in attorney fees.  For example, Talbot deposed Anthony Reider and Anne Taylor, individually and in her capacity as Wingstop's corporate representative.[5]  And on October 3, 2018, Talbott filed a thirty-one page motion for summary judgment, with twenty-one pages of exhibits (ECF No. 11).  The parties attended mediation shortly after Talbott filed the

---

[5] Talbott asserts that at some point during Ms. Talyor's deposition, Defendants "withdrew their affirmative defense of an offset" (ECF No. 17 at 7).

summary judgment motion (before Defendants filed a response to it), and the case settled at mediation except for the matter of Talbott's attorney fees and costs (*see* ECF No. 13).

In the instant thirty-three page motion for attorney fees, with sixty-six pages of attachments, Talbott notes that as part of the settlement agreement Defendants agreed to pay Malden a total of $586.11 in wages/liquidated damages, in addition to the final paycheck they had previously provided to Malden (*see* ECF No. 18 at 8).  Talbott claims that as a result of Defendants' agreement, Plaintiff thereby became a "prevailing party" under the FLSA (*id.*).

The Settlement Agreement itself reflects that although Defendants paid the additional amount to Malden, they did not concede liability or agree: (1) that Plaintiff was actually entitled to $586.11, which represented "the full amount of liquidated damages that Plaintiff *claim[ed]* entitlement to under this lawsuit"; or (2) that Talbott was entitled to attorney fees (*see* ECF No. 18-2 at 1) (emphasis added).  The Agreement also notes that the parties would request that the court determine whether attorney fees should be awarded and, if so, the amount to be awarded (*id.*).

In the instant motion for fees Talbott argues that Malden is a "prevailing party" under the FLSA, and he seeks $27,719.00 in attorney fees, representing 92.6 hours of

attorney time "spent litigating this case" (*see, e.g.*, ECF No. 18 at 31).  Separately, in a seventeen-page motion for costs, with fifteen pages of exhibits, Talbott seeks $1,602.33 in expenses (ECF No. 17 & Exhs.).  Talbott also seeks leave to supply the court with more information to resolve the matter of attorney fees, and thus has also filed a motion requesting authorization to file a reply to Defendants' response in opposition to his motions for fees and costs (ECF No. 23).  No "extraordinary circumstances" exist for permitting a reply.  *See* N.D. Fla. Loc. R. 7.1(I).  Therefore, no reply will be allowed.

Finally, after the parties reached the aforementioned settlement agreement at mediation, they filed a joint motion for approval of it (*see* ECF Nos. 13, 14, 19).  The district court granted the parties' joint motion and approved the agreement (ECF No. 20), although a final judgment has not yet been entered in this case.

Discussion

The court would be remiss if it did not begin this discussion by noting that federal district courts have become extraordinarily troubled by the proliferation of litigation arising from and surrounding the fee-shifting statutes.  As Judge Posner observed thirty years ago, when the courts were not as burdened as they are today:

> Fee litigation has become a heavy burden on the federal courts.  It can turn a simple civil case into two or even more cases—the case on the

merits, the case for fees, the case for fees on appeal, the case for fees providing fees, and so on ad infinitum, or at least ad nauseam.

Ustrak v. Fairman, 851 F.2d 983, 987 (7th Cir.1988).

Perhaps equally troubling "is how the courts have become coopted by the lawyers in their insatiable pursuit of attorney's fees," given that "there is little or no incentive for lawyers in fee-shifting situations to resolve a case before rushing to the courthouse." Spegon v. Catholic Bishop of Chicago, 989 F. Supp. 984, 987 (N.D. Ill. 1998), aff'd, 175 F.3d 544 (7th Cir. 1999). As the district judge in Spegon put it:

> The sooner the meter begins to run the better. And once the meter is turned on, it becomes extraordinarily expensive to turn it off. It is all too frequently the case that the only obstacle standing in the way of a settlement between a plaintiff and a defendant is the plaintiff's lawyer and his unreasonable demand for fees.
>
> Sadly, the result of this predicament is that defendants are often forced to litigate cases that they would rather settle and plaintiffs are obliged to forgo settlements that they would otherwise accept—all in an effort to secure "reasonable attorney's fees" for the plaintiff's lawyer. The only alternative to this Hobbesian nightmare is for a defendant to settle and accede to the plaintiff's lawyer's demands for fees at as an early a date as possible, thereby avoiding the possibility of a $200 judgment accompanied by a $20,000 petition for fees. Thus, the parties are held hostage and this Court is left feeling that it has become a party to an extortion.
>
> Congress unquestionably had loftier goals in mind when it passed much of the legislation authorizing fee awards. This Court does not question the congressional wisdom behind these statutes, but rather the lawyers who have chosen to hijack these statutes for their own selfish ends. The

legislative vision of public rights being vindicated by plaintiffs acting as a "private attorney general," *see, e.g.*, Newman v. Piggie Park Enters., 390 U.S. 400, 402, 88 S. Ct. 964, 966, 19 L. Ed. 2d 1263 (1968), has unfortunately given way to a flood of insignificant claims being litigated in the hopes of large attorney's fees.  Ultimately, this Court must rely on its limited discretion and the good faith of the parties to curb these abuses and to ensure that these statutes actually benefit the named plaintiff and society at large.

Spegon, 989 F. Supp. at 987.

With the foregoing in mind, the undersigned nevertheless recognizes that, "[i]n general, a prevailing FLSA plaintiff is entitled to an award of some reasonable attorney's fees and costs."  Sahyers v. Prugh, Holliday & Karatinos, P.L., 560 F.3d 1241, 1244 (11th Cir. 2009) (citing 29 U.S.C. § 216(b); Dale v. Comcast Corp., 498 F.3d 1216, 1223 n.12 (11th Cir. 2007); Kreager v. Solomon & Flanagan, P.A., 775 F.2d 1541, 1542 (11th Cir. 1985)).

The first question then is whether Malden is a prevailing plaintiff in this case. The FLSA instructs that, "*in addition to any judgment awarded to the plaintiff*," for unpaid minimum wages or unpaid overtime compensation, the court "shall . . . allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."  29 U.S.C. § 216(b) (emphasis added).  Construing this statute according to its ordinary meaning, the Eleventh Circuit has said that "[t]he FLSA plainly requires that the plaintiff receive a *judgment* in his favor to be entitled to attorney's fees and costs."

Dionne v. Floormasters Enterprises, Inc., 667 F.3d 1199, 1205 (11th Cir. 2012)

(emphasis added).   Likewise, the Supreme Court, considering the fee-shifting

provisions of two federal statutes[6] allowing courts to award attorney fees to the

prevailing party, has recognized that a plaintiff is a "prevailing party" only when he

obtains either (1) a judgment on the merits, or (2) a settlement agreement "enforced

through a consent decree." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't. of

Health and Human Res., 532 U.S. 598, 603–04, 121 S. Ct. 1835, 1839–40, 149 L. Ed.

2d 855 (2001), *superseded by statute on other grounds*, Open Government Act of

2007, Pub. L. No. 110–175, 121 Stat. 2524.   The Buckhannon Court reasoned that a

prevailing party needs a judgment or consent decree to prove that there has been an

"alteration in the legal relationship of the parties." *Id*. at 605, 121 S. Ct. at 1840.

Thus, in the absence of a judgment on the merits, to be a prevailing party, the FLSA

plaintiff needs a stipulated or consent judgment from the district court evincing the

court's determination that the settlement "is a fair and reasonable res[o]lution of a

bona fide dispute over FLSA provisions." Lynn's Food Stores, Inc. v. U.S. Dep't. of

Labor, 679 F.2d 1350, 1355 (11th Cir. 1982); *see also* Dionne, 667 F.3d at 1205

(requiring a judgment in the plaintiff's favor and reasoning that a district court's

---

[6] The statutes considered were the Fair Housing Amendments Act of 1988 and the Americans with Disabilities Act of 1990.

"minimal participation in [a] case is insufficient to give the case the 'judicial imprimatur' necessary for a party to prevail" (quoting Buckhannon, 532 U.S. at 605, 121 S. Ct. at 1840)).  The Eleventh Circuit has also held that if the district court "either incorporates the terms of [the parties'] settlement into its final order of dismissal or expressly retains jurisdiction to enforce [the] settlement," these judicial actions serve as the "functional equivalent" of a consent decree in compliance with Buckhannon.  American Disability Ass'n, Inc. v. Chmielarz, 289 F.3d 1315, 1320 (11th Cir. 2002).

Here, the district court incorporated the terms of the parties' settlement agreement into an order approving of the agreement, and in so doing cited among other authorities Lynn's Food Stores, Inc., 679 F.2d at 1350 (see ECF No. 20). Although the district court's order is not a final order of dismissal or a final judgment, this is only because the matter of attorney fees and costs remains unresolved, was referred to the undersigned for a recommended disposition, will be addressed by the district court when final judgment is entered in this case (see id. at 5 n.2), and is the only matter holding up entry of a final judgment.  The undersigned concludes that under these circumstances Plaintiff is a prevailing party, as the district court's actions thus far evince a determination that the parties' Settlement Agreement is a fair and

reasonable resolution of an FLSA dispute or are otherwise the "functional equivalent" of a consent decree in compliance with Buckhannon.

The question of whether to award fees, however, does not end with this court's determination that Malden is a prevailing party. In some cases, a district court may exercise its discretion—and use its inherent powers to supervise the conduct of lawyers who come before it—to conclude that a "reasonable fee" to a prevailing plaintiff in an FLSA case is "no fee." Sahyers, 560 F.3d at 1244. As explained below, the undersigned finds in this case that "no fee" is a reasonable fee.

In Sahyers, the Eleventh Circuit affirmed a district court's denial of attorney fees and costs totaling approximately $15,640 to a prevailing FLSA plaintiff who settled her claim for $3,500, noting that at no time prior to filing suit did plaintiff's counsel attempt to resolve the matter with the defendants by phone call, email, or letter "to inform them of [p]laintiff's impending claim much less to resolve this dispute before filing suit." Sahyers, 560 F.3d at 1245. Here, as in Sahyers, Talbott made no effort to resolve this dispute before filing suit, although it bears noting that the gap between the settlement amount and the attorney fee demand here is larger than it was in Sahyers, making the failure to make a pre-suit attempt to resolve the dispute more consequential. Even if Talbott could not have known at the outset of this

litigation how large his attorney fees would grow, he certainly knew about the *minimal* amount in controversy when he initiated this action (and he had some control over the mounting fees/costs as this case wore on).  *See also* Nelson v. Kobi Karp Architecture & Interior Design, Inc., No. 17-23600-CIV, 2018 WL 3059980, at *3 (S.D. Fla. May 8, 2018), *reconsideration denied*, No. 17-23600-CIV, 2018 WL 3059647 (S.D. Fla. June 19, 2018) (denying attorney fees to prevailing plaintiff and noting that although "the FLSA does not contain any pre-suit notice or demand requirement, given the very small amount at issue it is likely this matter could have been resolved without the necessity of filing suit."); Goss v. Killian Oaks House of Learning, 248 F. Supp. 2d 1162, 1168 (S.D. Fla. 2003) (denying attorney fees to prevailing FLSA plaintiff because, inter alia, the case "should have been a pro forma matter that could have been disposed of by making a few phone calls before filing suit"; also stating, "[t]o ask in good faith for upwards of $16,000 in attorney's fees for prosecuting a case that Plaintiff's counsel knew would involve no more than a modest sum of $316, and to continue to engage in a pattern of behavior aimed at inflating the levels of attorney's fees shocks the conscience of the Court.").

Although Talbott has not argued as much in his filings, to the extent he might claim that Malden demanded that he file this suit without first attempting to resolve

the matter,[7] the contention would not change the undersigned's view or recommendation.   A lawyer's duties as a member of the bar—an officer of the court—are generally greater than a lawyer's duties to the client.  *See* Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1546 (11th Cir. 1993) ("An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly.  This concept is as old as common law jurisprudence itself."); Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1327 (11th Cir. 2002) ("Independent judgment is an essential ingredient of good lawyering, since attorneys have duties not only to their clients, but also, as officers of the court, to the system of justice as a whole.") (internal quotation marks omitted).

That said, the court does not find that pre-suit attempts to settle are *always* required.  The court finds that under the facts and circumstances of *this* case an attempt was required.  In so finding, the court has considered among other factors the minimal amount in controversy and the likelihood that an attempt at resolution would have been successful.  The court also notes that a pre-suit inquiry would have

---

[7] A billing entry in Talbott's time records, dated February 3, 2018, states: Telephone call from client regarding Drafting Complaint immediately; Email to staff regarding same." (ECF No. 18-5 at 4).

simultaneously satisfied Talbott's obligations under Rule 11 of the Federal Rules of

Civil Procedure.

> In pertinent part, Rule 11 provides:
>
> [b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*: . . .
>
>> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; [or] . . .
>>
>> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b)(1), (3) (emphasis added).

Thus, Rule 11 imposes upon attorneys an affirmative duty to conduct a

reasonable investigation into the facts of a claim before filing suit. Talbott's billing

records show no evidence of any such investigation or inquiry into the facts, other

than inquiries of his own client (*see* ECF No. 18-5 at 4–5). Even if a client's

uncorroborated statements alone are enough to satisfy a lawyer's obligations under

Rule 11, here Talbott knew Malden had been fired because he had been accused of

threatening Defendant Taylor and that he had been banned from the Wingstop

premises by the police.  These circumstances should have caused Talbott some hesitation in accepting Malden's unsubstantiated words, and in using those same words to draft the allegations of the complaint.  The circumstances should have also caused Talbott to question Malden's motivation for suing Taylor and Wingstop and thereby should have prompted him to at least attempt to confirm Malden's allegations—which still remain in dispute—before filing suit.

Had Talbott contacted Wingstop pre-suit, he might have confirmed what Ms. Taylor has stated in her affidavit—that Wingstop would have mailed Malden the check had he simply asked them to do so, totally obviating the need for this lawsuit. Alternatively, Talbott might have learned that Malden admitted he had (and then lost) a handbook and was willing to pay for it by having his last paycheck offset proportionately to account for it.  To the extent the proposed offset would have in fact violated the FLSA as Talbott contends (and Defendants purportedly acknowledged), Wingstop likely would have released the check upon being advised that an offset was improper, rather than risk federal litigation over $120.  Likewise, had Talbott discovered that the final paycheck was being held "hostage," that Malden never had or lost a handbook, and that Malden did not have $120 to give Wingstop in order to receive his final paycheck, again Talbott could have communicated to Wingstop that

it did not have a right to withhold the final paycheck from Malden.[8]  In other words, Talbott could have given Wingstop a chance to correct what might have been a non-willful—and easily remedied—violation of the FLSA.

 In addition to requiring attorneys to conduct a reasonable factual investigation before filing suit, Rule 11 also "requires [litigants] . . . to advise the court of any changes [thereafter]." Attwood v. Singletary, 105 F.3d 610, 613 (11th Cir. 1997) (per curiam).  An attorney's duty therefore continues after a complaint is filed, because "obligations under Rule 11 are not measured solely at the time of filing." *Id*. (citing Turner v. Sungard Business Systems, Inc., 91 F.3d 1418, 1422 (11th Cir. 1996) (discussing the continuing nature of a litigant's responsibility under Rule 11)).

Talbott's billing records show that just days after the complaint was filed, he became aware that an arrest for Malden was "imminent" on felony theft charges (*see* ECF No. 18-5 at 5 (billing entries dated February 23, 2018, discussing same)).[9]  So by February 23, which was before Defendants were served (*see* ECF Nos. 4, 5), Talbott knew of Madlen's impending arrest on a felony offense involving dishonesty,

---

[8] The undersigned finds the third scenario to be unlikely, considering the affidavits of record and the events that transpired in this case.  In any event, it matters not; the main point here is that Talbott failed to contact Wingstop before filing suit.

[9] A later entry dated May 10, 2018, shows that Talbott received a call from Malden's mother advising that Malden had indeed been arrested for Grand Theft (ECF No. 18-5 at 7).

as well as the circumstances surrounding Malden's firing.  Yet Talbott still took no action to confirm the factual allegations set forth in the complaint (or to resolve this matter).

A final point bears mention.  Talbott initiated a similar FLSA case in this district in 2017, <u>Moss v. Pav'r Construction, Inc., et al.</u>, No.  3:17cv408/RV/EMT (N.D. Fla., filed June 14, 2017).  In <u>Moss</u>, Talbott raised an FLSA claim based on defendants' withholding Moss' final paycheck in the amount of $248.31, after Moss broke company equipment that was worth more than he was owed.  The defendants did not contest that (unbeknownst to them) their actions violated the FLSA, but their attorney was unable to settle the case due to Talbott's attorney fee demands.  As in this case, Talbott filed a motion for summary judgment.  In <u>Moss</u>, however, the defendants filed a response to the summary motion, and in their response defendants *stipulated* to a judgment against them, as they did not contest that their actions violated the FLSA, albeit unknowingly.  Judge Vinson granted summary judgment in favor of Moss in the amount of $496.62, or twice the value of Moss' final paycheck (*see* <u>Moss</u>, ECF No. 37).  Judge Vinson recognized that by granting summary judgment in favor of Moss, Moss thereby became the prevailing party.  Judge Vinson noted that he expected Talbott to file a motion seeking attorney fees, but he

forewarned Talbott that continuing to expend energy on the case would likely result

in no more than a nominal attorney fee award (*see* <u>Moss</u>, ECF No. 37).

More specifically, Judge Vinson stated:

> In addition to the monetary judgment, the plaintiff requested that I make a determination that he is the prevailing party for attorney fee purposes. . . . . Although there is no motion for attorney fees pending at this time, it is expected that one will be filed.  Before the parties expend the energy, however, the plaintiff should be advised that based on the particular facts and record of this litigation (including, inter alia, the exceedingly small amount of damages at issue and the fact that defendants previously stipulated to a judgment in that amount), I am not inclined to award much—if anything—more than a nominal fee award.

(<u>Moss</u>, ECF No. 37 at 2 n.4) (citations omitted).

Undeterred, Talbott "expended the energy" and filed a contested thirty-one page

motion for attorney fees, with seventy-two pages of exhibits, and a nine-page motion

for costs, with eighteen pages of exhibits (<u>Moss</u>, ECF Nos. 41, 42 & Exhs.).  In a

lengthy order, Judge Vinson ultimately concluded that a reasonable fee in the <u>Moss</u>

case was no fee at all.  Judge Vinson determined that Talbott had presented inflated

billing records and engaged in unprofessional conduct, and he went so far as to say

he would have awarded attorney fees to *Defendants' counsel* in <u>Moss</u> had they asked

for such fees (*see* <u>Moss</u>, ECF No. 52).

Having not scrutinized Talbott's time records in the instant case as Judge Vinson did in the Moss case, the undersigned does not reach any firm conclusions regarding whether they are inflated here.  The undersigned has scrutinized the records, however, to determine that Talbott spent **68.4** hours engaging in discovery and otherwise prosecuting this case **after** June 20, 2018, the day Judge Vinson specifically warned him of the likelihood of only a nominal attorney fee award in Moss (*see* ECF No. 18-3 at 5–15).[10]  It matters not that the instant case is assigned to Judge Rodgers, and not Judge Vinson.  The warning from Judge Vinson was clear, and the similarities between the Moss case and this case are also unavoidably clear, such that any reasonable lawyer ought to have heeded the warning and modified his or her litigation tactics accordingly.  In choosing to continue fervently litigating this case, Talbott bore the risk that he might not be compensated.  His request for fees failed in the Moss case, and for the same reasons it failed there, it should fail here.

In both Moss and in this case, minimal amounts of earnings were withheld (i.e., approximately $250 and $545), the earnings withheld were final paychecks, the

---

[10] In reviewing the billing records for this purpose, the undersigned did note that Talbott included in the 92.6-hour total for which he seeks fees, time spent discussing Malden's criminal case with Malden, his mother, his public defender, and detectives (*see, e.g.*, ECF No. 18-5 at 5, 7, 8, 17). This time would obviously be excluded if any attorney fees were to be awarded here (as Defendants argue) (*see* ECF No. 21 at 16–21 (defendants also object to numerous other billing entries by Talbott as duplicative or related to purely clerical or administrative work (among other objections))).

paychecks were withheld (or allegedly withheld) due to damaged or missing property of the employer, no pre-suit attempts to settle were made, the attorney fees amounts were both approximately $28,000 (and therefore grossly lopsided when compared to the amounts in controversy), and in each case defense counsel offered to settle but the barrier to settlement—and the primary cause of this court's involvement—has neither been about the merits of either case nor related to Congress' lofty goals in enacting the FLSA; instead, it has been about Talbott's demand for fees.[11]

For all of the reasons set forth above, the undersigned recommends that Plaintiff's motions for costs and attorney fees each be denied in their entirety.  This recommendation is obviously in line with Judge Vinson's decision in Moss, but it is also in line with other decisions in this circuit, including Sahyers, Goss, and Nelson, *supra*.  For example, in Nelson, 2018 WL at 3059980, the plaintiff alleged that her employer had failed to pay her for two days of work, a claim worth (at most) $232.  *Id.*, at *1.  She hired an attorney who, instead of calling her employer to try and

---

[11] Moss involved a Rule 68 Offer of Judgment by defendants, which was not timely accepted by Talbott, such that attorney fees accumulated after the offer likely would not have been compensable anyway.  No Rule 68 Offer was made in the instant case.  This distinction between the two cases does not preclude reliance on Moss as a persuasive decision.  For one, the Rule 68 offer in Moss was made seven months after the case was filed (and four months after defendants had been served), yet Judge Vinson failed to award any attorney fees, including fees that accumulated *before* the Rule 68 offer.  Moreover, the myriad reasons Judge Vinson articulated for deciding not to award fees support the undersigned's decision to recommend the same here (*see* Moss, ECF No. 52).

resolve the matter, filed a case under the FLSA.  *Id*.  Her employer tendered payment,

thus making her the prevailing party, and the plaintiff moved for $9,065 in attorney's

fees.  *See id.*  After citing and discussing Sahyers and Goss, the district court denied

her motion, concluding that plaintiff's counsel's "sole intent" was to "run up his bill"

and, under such circumstances, "the Court finds it unreasonable, unjust, and

inequitable to award Plaintiff any fees."  *Id*. at *2–3;  *see also, e.g.*, Woods v. On

Baldwin Pond, No. 6:13cv726-Orl-41DAB, 2016 WL 4927639 (M.D. Fla. Sept. 16,

2016) (denying plaintiff's request for attorney fees in the amount of $48,028.75 after

he obtained "a nominal judgment" of $720, noting that although fees are "generally"

available to prevailing plaintiffs in FLSA cases, "there are special circumstances

where 'a reasonable fee and cost award [is] zero,'" and a lawyer trying to "shake

down" an employer in a case involving "minuscule damages" presents such a

circumstance) (citing Sahyers and Goss).

Accordingly, it is **ORDERED** that:

Plaintiff's motion for leave to file a reply (ECF No. 23) is **DENIED**.

And it is respectfully **RECOMMENDED** that:

Plaintiff's motions for attorney fees and costs (ECF Nos. 17, 18) be **DENIED**.

At Pensacola, Florida, this <u>20th</u> day of February 2019.


<u>/s/ *Elizabeth M. Timothy*</u>
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**